IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS SHELLEY,

                                                    OPINION AND ORDER

               Plaintiff,

                                                    09-cv-69-bbc

     v.

RANDALL HEPP,
TAMMY MAASSEN
and DR. REYNOLDS, BRET,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Thomas Shelley, a prisoner at the Jackson Correctional Institution in Black River Falls, Wisconsin, has filed a civil complaint under 42 U.S.C. § 1983 against defendants Dr. Bret Reynolds, Randall Hepp and Tammy Maassen for denying him adequate medical care under the Eighth Amendment.  Because plaintiff alleged he was in imminent danger of serious physical harm, I granted him leave to proceed in forma pauperis on his claims, despite his having accrued three strikes under 28 U.S.C. § 1915(g).

Now before the court is plaintiff's motion for preliminary injunctive relief in which he seeks to be re-prescribed medications that were discontinued by defendant Reynolds.  In an April 6, 2009 order, I concluded that the proposed findings of fact submitted by plaintiff

1

failed to include key information alleged in the complaint and thus failed to show a basis for preliminary injunctive relief.  I gave plaintiff a chance to supplement his proposed findings of fact, which he has done.  Defendants have submitted responses to both sets of proposed findings of fact as well as their own proposed findings of fact.

I will deny plaintiff's motion for preliminary injunctive relief because he has failed to show any likelihood of success on his Eighth Amendment claim.  Also, plaintiff has filed a motion for appointment of counsel, which I will deny.

For the sole purpose of deciding this motion for a preliminary injunction, I find from the parties' submissions, including plaintiff's medical records, that the following facts are material and undisputed.

UNDISPUTED FACTS

Plaintiff Thomas Shelley is a prisoner at the Jackson Correctional Institution, located in Black River Falls, Wisconsin.  All of the defendants work at the Jackson Correctional Institution:  Bret Reynolds is a part-time consultant psychiatrist; Randall Hepp is the warden; and Tammy Maassen is the Health Services Unit manager.

At some point in the past, plaintiff was diagnosed with Attention Deficit/Hyperactivity Disorder, Attention Deficit Disorder, "Acute Reaction," Post-Traumatic Stress Disorder and Polysubstance Dependence.  From approximately 2004 to

December 2008, plaintiff was prescribed numerous different medications by several doctors, including those treating him while he was incarcerated in various Wisconsin prisons. From approximately 2004 to December 2008, plaintiff's doctors increased his dosages of Adderall and Seroquel numerous times. His dosages were last increased by Dr. Toni Ducrest at the Dodge Correctional Institution. The treatment plan signed by Ducrest on November 15, 2008, called for plaintiff to take two 40 milligram dosages of Adderall and 250 milligram and 50 milligram dosages of Seroquel daily.

Adderall is a highly addictive and abusable medication that is used in the treatment of Attention Deficit/Hyperactivity Disorder. A history of substance abuse is a listed contraindication for prescribing Adderall. Abusing this type of medication poses potentially life-threatening cardiac and neurological risks.

Seroquel is an antipsychotic medication meant for individuals with a formal thought disorder such as schizophrenia. Seroquel can be an effective anti-psychotic medication in dosages of 600-1000 milligrams. It is becoming more commonly used in dosages of 50-300 milligrams for "off label" purposes as a sleep aid or tranquilizer. Even at lower doses, Seroquel has very significant side effects and health risks in addition to its abuse potential. Side effects from discontinuation of low dosages of Seroquel in non-psychotic individuals are usually limited to insomnia and irritability. Because of the risks associated with the use of Seroquel, the Department of Corrections removed it from its medication formulary as of

3

May 1, 2009.  All patients on Seroquel were to be evaluated to see whether their diagnoses warranted continued use of an anti-psychotic, and if so, they were to be moved gradually to a new drug, unless they were approved for a waiver.

Plaintiff arrived at the Jackson Correctional Institution on December 23, 2008.  On January 5, 2009, he placed a health service request for refill of his prescriptions for Adderall and Seroquel.  Also on January 5, 2009, nursing staff informed defendant Reynolds of two new inmates, one of them plaintiff, who were now in segregation for having diverted their psychotropic medications (plaintiff was accused of "cheeking" his medication, or hiding it in his mouth with the intent to retain it for a purpose other than taking it as prescribed).  Both Adderall and Seroquel are often "cheeked" by inmates in order to sell, trade or abuse the drugs by ingesting multiple doses.

Defendant Reynolds briefly reviewed plaintiff's medical charts as well as revocation and pre-sentence reports available through the Department of Corrections computer system.  He was concerned about plaintiff's extensive history of substance abuse, including his most recent criminal incident, in which he was found to have 50 tablets of Adderall in his possession when he was arrested after selling other medications to an undercover police officer.

Plaintiff met with defendant Reynolds on January 6, 2009.  The parties dispute precisely what occurred at the meeting but they agree that Reynolds told plaintiff that his

4

medications were being discontinued.  From what learned of plaintiff at the January 6 appointment and from his review of plaintiff's medical and legal records, Reynolds made a diagnosis of Antisocial Personality Disorder.  He was not persuaded that plaintiff had Attention Deficit/Hyperactivity Disorder or a psychotic illness.  Antisocial Personality Disorder is not considered a severe mental illness; it is a disorder tied to a person's emotional development.  Psychotherapy is the treatment of choice for Antisocial Personality Disorder; psychotropic medications are not an effective treatment.

Following the discontinuation of his medications, plaintiff experienced many symptoms, including upset stomach, anxiety, lack of focus, concentration and attention span, failure to complete tasks, poor memory, insomnia, nightmares, "recurrent images," psychotic thoughts of wanting to harm people, severe headaches, and the feeling that his mind is being controlled by another.

On January 8, 2009, plaintiff told the staff member (the parties do not explain who the staff member was) on psychological rounds, "I'm hurting."  The staff member responded that plaintiff would be experiencing unpleasant withdrawal symptoms but that they would subside eventually.

Plaintiff submitted at least ten health service or psychological service requests in January 2009 following the discontinuation of his medications in which he complained about his symptoms.  These requests were responded to by various prison officials, including

5

defendants Reynolds and Maassen.  Reynolds responded to two of these requests by telling plaintiff to work with staff psychologists on his emotional issues, and in one of the responses he told plaintiff to see a Dr. Alder for medical problems.  An unnamed staff member (the staff member's identity cannot be ascertained by the signature on the health service request) provided plaintiff with extra strength Tylenol in response to his January 15, 2009 complaint of severe headaches.  On January 20, 2009, a C. Cullen, one of the staff psychologists, responded to a psychological  service request, stating, "We will continue to monitor you." On January 23, 2009, defendant Maassen responded to plaintiff's requests in a memorandum, in which he stated that, "You were taken off the meds due to two reasons. Those include diverting meds as well as your diagnosis not supporting the use of these types of meds."

On February 3, 2009, plaintiff met with Dr. Alder regarding his stomach problems. Alder placed plaintiff on Omeprazole and scheduled lab work to find the problem.  Also, Alder referred plaintiff for a psychiatric evaluation with defendant Reynolds.  Plaintiff complained of nightmares regarding the violent death of his sister and how they prevented him from eating or sleeping.  Plaintiff attempted to reopen the issue of being prescribed Adderall, but accepted Reynolds's explanation that he would not prescribe him that medication.  Plaintiff then demanded to be put back on Seroquel so that he could sleep and to prevent him from acting out violently.  Reynolds explained that he would not prescribe

plaintiff an antipsychotic medication just as a tranquilizer, and offered him a trial of Citalopram, which is used to treat anxiety disorders and depression.  Plaintiff reluctantly agreed to try Citalopram as an alternative to Seroquel.

Plaintiff took only a few doses of Citalopram before choosing to stop it.  He signed a written refusal for the medication at the Health Services Unit and defendant Reynolds discontinued the prescription the next day he worked at the institution.  Plaintiff wrote multiple health service requests claiming that the Citalopram caused numerous side effects, such as suicidal thoughts, psychotic thoughts, shaking hands and difficulty sleeping.  These complaints were inconsistent with any effect that might be caused by a few doses of Citalopram. Defendant Reynolds responded to plaintiff's requests, telling him that he would be seen at his regular visit, and that he should work with the clinical psychologists and participate in "mood group."

Defendant Reynolds met with plaintiff for his regular medication follow-up visit on March 17, 2009.  Plaintiff again sought to be put back on Adderall and Seroquel, but Reynolds refused to prescribe them.

Plaintiff is not currently prescribed any psychotropic medications and he is not scheduled for any medication follow-up treatments.  Neither the staff psychologists nor the medical clinic has since referred plaintiff for another meeting with defendant Reynolds.  The psychologists maintain offices in the inmates' housing units; all inmates with emotional

7

issues are seen on a scheduled basis by the psychologists, who are able to monitor inmates informally throughout the day.  Plaintiff continued to submit health service requests through May 2009, and Reynolds responded by telling him to meet with the psychologists to learn coping skills and work on his mood issues.  In a May 18, 2009 memorandum to plaintiff, Reynolds stated, "I advise you to <u>continue</u> working with Dr. Burss (presumably one of the psychologists).  I still don't feel that medications are the proper treatment for you and continue to encourage you to focus on therapy options." (Emphasis in original.)

## DISPUTED FACTS

The parties dispute the following facts:

● What occurred at plaintiff's January 6, 2009 appointment.  Plaintiff states that defendant Reynolds called him by an incorrect name, "Mr. Smeller," and discontinued his medications after meeting only 90 seconds with him, stating that it was "Jackson's way," and that the medications were "addicting."

Defendants state that defendant Reynolds decided to discontinue plaintiff's Adderall prescription on January 5, 2009, after reviewing his medical charts and legal records. Further, Reynolds decided to "hold" plaintiff's Seroquel prescription until he could review his full medical record before meeting with him the next day because his review of plaintiff's records showed no description of any psychotic illness.  The January 6 meeting lasted about

8

10 minutes.  Reynolds admits he called plaintiff by the incorrect name but corrected himself and apologized for the mistake.  However, plaintiff displayed a confrontational attitude with Reynolds and was angry and uncooperative during the meeting.  At the meeting, plaintiff exhibited no symptoms of depression, anxiety disorder or psychotic illness.  Reynolds informed plaintiff that because of his substance abuse history and diversion of medications, Reynolds was unwilling to provide plaintiff a highly addictive and abusable medication like Adderall, when plaintiff showed no indication of needing an anti-psychotic.  Plaintiff ended the meeting by standing at the inmate door and stating, "Well that's just the way it's gonna be."   Reynolds believed plaintiff's previously reported symptoms of Attention Deficit/Hyperactivity Disorder were much more consistent with the emotional and behavioral disturbances seen in Antisocial Personality Disorder rather than the impairment of structure, learning and function demonstrated by those with Attention Deficit/Hyperactivity Disorder.

• The extent to which plaintiff utilized clinical psychological treatment as an alternative to medication.  Defendants state that defendant Reynolds repeatedly recommended that plaintiff work with clinical psychology staff, but that he has refused to. Plaintiff says he "has always worked with" clinical psychology staff.

• The seriousness of the side effects of abruptly discontinuing Adderall.  Defendants state there are very limited side effects noted from abrupt discontinuation of Adderall, even

9

after extended use of high doses.  Plaintiff cites a health website that states, "You may develop severe depression and extreme tiredness if you suddenly stop taking [Adderall] after overusing it."

OPINION

"The granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 389 (7th Cir. 1984).  The standard applied to determine whether a plaintiff is entitled to preliminary injunctive relief is well established:

> A district court must consider four factors in deciding whether a preliminary injunction should be granted.  These factors are: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction will disserve the public interest.

Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989).  At the threshold, plaintiff must show some likelihood of success on the merits and the probability that irreparable harm will result if the requested relief is denied.  If plaintiff makes both showings, the court then moves on to balance the relative harms and public interest, considering all four factors under a "sliding scale" approach.  See In re Forty-Eight Insulations, Inc., 115 F.3d 1294, 1300 (7th Cir. 1997).  Thus, to obtain a preliminary injunction, a movant must

10

first prove that his claim has "at least some merit."  Digrugilliers v. Consolidated City of Indianapolis, 506 F.3d 612, 618 (7th Cir. 2007) (citing Cavel International, Inc. v. Madigan, 500 F.3d 544, 547 (7th Cir. 2007)).

After considering the parties' submissions regarding plaintiff's motion for a preliminary injunction, I am persuaded that plaintiff has failed to show some likelihood of success on the merits of his § 1983 claim.  Plaintiff contends that the defendants each denied or are denying him adequate medical care under the Eighth Amendment, which prohibits cruel and unusual punishment.  Under the Eighth Amendment, a prison official may violate a prisoner's right to medical care if the official is "deliberately indifferent" to a "serious medical need."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person.  Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006).  A medical need may be serious if it "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), if it causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

"Deliberate indifference" means that prison officials know of and disregard an excessive risk to inmate health and safety.  Farmer, 511 U.S. at 837.  Inadvertent error,

11

negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment.  Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996); Snipes v. DeTella, 95 F.3d 586, 590-91 (7th Cir. 1996).  Thus, disagreement with a doctor's medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim.  Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996).  Instead, "deliberate indifference may be inferred [from] a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole, 94 F.3d at 261-62.

Plaintiff raises two main arguments in support of his position that defendant Reynolds was deliberately indifferent to his serious medical needs. (Plaintiff also brings claims against defendants Maassen and Hepp for failing to intervene in defendant Reynolds's treatment decisions, but because I conclude that plaintiff fails to show some likelihood of success on his deliberate indifference claim against Reynolds, I need not address these claims.)  The first is that defendant Reynolds cavalierly discontinued plaintiff's Adderall and Seroquel in a minute and a half meeting and then largely ignored his complaints.  However, the undisputed facts in the record show that Reynolds provided plaintiff with treatment,

12

albeit not the particular treatment plaintiff desired.  Reynolds diagnosed plaintiff with Antisocial Personality Disorder, a condition that is not effectively treated by the use of psychotropic medications.  He believed plaintiff's reported symptoms matched this disorder rather than Attention Deficit/Hyperactivity Disorder.  In any case, because of plaintiff's substance abuse history and attempted diversion of his medications, Reynolds was unwilling to provide plaintiff with a highly addictive and abusable medication such as Adderall.

As for plaintiff's prescription for Seroquel, it is undisputed that his prescribed dosages were inconsistent with treatment for a psychotic illness and that his records show no history of a diagnosis of a psychotic illness.  Rather, the dosages were consistent with use as a sleep aid or tranquilizer.  Reynolds discontinued the Seroquel prescription for the same reasons he discontinued the Adderall:  his diagnosis of a disorder that is not treated with psychotropic medications and plaintiff's substance abuse history.

Regarding plaintiff's contentions that defendant Reynolds called him by the wrong name at the January 6, 2009 appointment and then discontinued his medications after only a minute and a half, plaintiff does not deny that Reynolds reviewed his medical charts and legal records beforehand as part of his decision making process. Also, even under his version of the events, plaintiff states that Reynolds discontinued the medications in part because the medications "were addicting," which matches one of Reynolds's stated rationales for discontinuing the medication and suggests that he exercised his professional judgment in

13

doing so.

Moreover, insofar as plaintiff argues that defendant Reynolds largely ignored his later complaints, undisputed facts show that he has responded to plaintiff's health service requests, had two follow-up appointments with him, offered plaintiff a trial of Citalopram for his anxiety and then discontinued the medication when plaintiff complained about its side effects.  It should also be noted that defendant Reynolds is not the only health care provider at the prison; other medical staff have provided plaintiff with Tylenol for headaches and Omeprazole for his stomach problems.  Finally, it is undisputed that Reynolds has repeatedly emphasized to plaintiff his own behalf that therapy is the best way to treat his symptoms and he has recommended to plaintiff that he meet with staff psychologists and participate in "mood group."  The psychologists maintain offices in the inmates' housing unit, continue to monitor plaintiff and have not referred plaintiff for another appointment with Reynolds.

Plaintiff's second argument is that regardless of the treatment he has received at the Jackson Correctional Institution, defendant Reynolds was deliberately indifferent to his serious medical needs by making the diagnosis of Antisocial Personality Disorder and discontinuing medications previously prescribed to him by several other doctors.  However, "mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."  Estate of Cole, 94 F.3d at 261.  At this

14

point in the proceedings, nothing in the record, such as expert testimony, suggests that Reynolds's treatment decisions were a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Id. at 261-62. Instead, the undisputed facts indicate that Reynolds considered plaintiff's history of treatment and substance abuse problems in making his diagnosis. Therefore, I conclude plaintiff has failed to show some likelihood of success on the merits of his claim against Reynolds. Accordingly, I will deny his motion for preliminary injunctive relief.

There is a final issue. Plaintiff has filed a motion for appointment of counsel. In deciding whether to appoint counsel, I must first find that plaintiff has made reasonable efforts to find a lawyer on his own and has been unsuccessful or that he has been prevented from making such efforts. Jackson v. County of McLean, 953 F.2d 1070 (7th Cir. 1992). To show that he has made reasonable efforts to find a lawyer, plaintiff must give the court the names and addresses of at least three lawyers that he has asked to represent him in this case and who turned him down. Plaintiff has provided a list of five lawyers who turned him down. Although plaintiff has made reasonable efforts to find a lawyer, he does not require appointment of counsel.

In resolving a motion for appointment of counsel, a district court must consider both the complexity of the case and the pro se plaintiff's ability to litigate it himself. Pruitt v.

15

<u>Mote</u>, 503 F.3d 647, 654-55 (7th Cir. 2007).  In a letter attached to his motion, plaintiff states that "[i]t is getting harder to cope with daily activities" because his medications have been discontinued.  However, with guidance from the court, plaintiff satisfactorily presented his case in support of his motion for preliminary injunctive relief, even though I am ultimately denying that motion.  At this point, the complexity of plaintiff's case boils down to a disagreement about whether defendant Reynolds's treatment decisions indicated deliberate indifference.  In order to survive summary judgment, plaintiff will have to supplement his case with evidence, such as expert testimony, showing that Reynolds's treatment decisions were a "substantial departure from accepted professional judgment."  It is not appropriate to appoint counsel for the sole task of assisting plaintiff in obtaining expert testimony.  Therefore, I will deny plaintiff's motion for appointment of counsel.


ORDER

IT IS ORDERED that:

1.  Plaintiff Thomas Shelley's motion for preliminary injunctive relief, dkt. #5, is DENIED.

16

2.  Plaintiff's motion for appointment of counsel, dkt. #32, is DENIED.

Entered this 13th day of August, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

17